IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 1:21-CR-036 (GPG/JMC)

**UNITED STATES OF AMERICA**

v.

**JASON KETZNER,**

    Defendant.

---

## JASON KETZNER'S MOTION TO DISMISS THE INDICTMENT

Mr. Ketzner, through undersigned counsel, respectfully moves the Court to dismiss the indictment because 18 U.S.C. § 922(g)(1) is unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), both facially and as applied to persons like him, whose only possibly qualifying prior offenses are nonviolent. Mr. Ketzner recognizes that Second Amendment challenges to Section 922(g)(1) are currently disallowed under Tenth Circuit precedent, *see Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), and files this motion for preservation purposes only.

**I.    PROCEDURAL HISTORY**

Mr. Ketzner is charged with violating 18 U.S.C. § 922(g)(1). Docket Entry Number ("DE") 1. The charge carries a statutory maximum sentence of ten years. According to the bail report, DE 19, and relevant here, Mr. Ketzner has four drug possession offenses, *id*. at 3 – 16, one check forgery conviction, *id*. at 4, and one unlawful possession of a firearm conviction.[1] *Id*. at 5.

---

[1] Mr. Ketzner was previously convicted of the fifth degree assault. DE 19:3. Fifth degree assault is a misdemeanor. Minn. Stat. Ann. § 609.224 (whoever "(1) commits an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflicts or attempts to inflict bodily harm upon another."). Minnesota law prohibits those convicted of misdemeanor

## II.   *BRUEN* ESTABLISHES THE TEST FOR ADJUDICATING CHALLENGES TO LAWS RESTRICTING SECOND AMENDMENT RIGHTS

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court has held that the Second Amendment codified a pre-existing individual right, *District of Columbia v. Heller*, 554 U.S. 570 (2008), and it has cautioned that the right cannot be treated as a "second class right" compared to other Bill of Rights provisions, *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). *Heller* did not establish the test for evaluating the constitutionality of firearm regulations under the Second Amendment, however. *See Silvester v. Becerra*, 138 S. Ct. 945, 948 (2018) (Thomas, J., dissenting from denial of certiorari) (explaining that "*Heller* did not definitively resolve the standard for evaluating Second Amendment claims"). Instead, the Court set a floor — "whatever else" the Amendment "leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

The *Heller* Court also recognized that, as its "first in-depth examination of the Second Amendment," it was not "clarify[ing] the entire field." *Id.* at 635. It noted that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," but specifically emphasized that it did "not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626.

Following *Heller*, the federal courts of appeals generally developed a two-step inquiry for deciding Second Amendment challenges, with the second step involving means-end balancing. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. In addition, the Tenth Circuit rejected a constitutional

---

assault in the fifth degree from possessing a firearm. Minn. Stat. Ann. § 609.165, Subd. 1b; Minn. Stat. Ann. § 624.712, Subd. 5.

challenge to Section 922(g)(1) by giving controlling weight to dictum in *Heller* regarding the supposedly "longstanding prohibitions on the possession of firearms by felons." *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (quoting *Heller*, 554 U.S. at 626).

It was not until *Bruen* that the Court established the test for evaluating laws, like § 922(g)(1), that infringe on this fundamental right. Specifically, *Bruen* teaches that all conduct covered by the plain text of the Second Amendment is presumptively constitutional, and that the government must justify any laws that infringe on such presumptively constitutional conduct with a robust historical record of sufficiently similar laws dating back to the founding era. *See* 142 S. Ct. 2111. As explained below, Section 922(g)(1) does not survive *Bruen*'s stringent test.

### A. *Bruen* Established a Test Rooted Solely in the Second Amendment's Text and History.

In 2022, the Supreme Court did what it did not do in *Heller*; it disavowed applying means-end scrutiny and adopted a "text-and-history" standard in its place – finally establishing a "standard for evaluating Second Amendment claims." *Bruen,* 142 S. Ct. at 2127, 2138. Specifically, *Bruen* explains that (1) conduct covered by the plain text of the Second Amendment is presumptively protected and cannot be restricted, *id.* at 2129, unless (2) the government can demonstrate a historical tradition of "distinctly similar" regulations (in the case of "general societal problem[s] that [have] persisted since the 18th century")*, id.* at 2131, or "relevantly similar" analogues (in the case of "unprecedented societal concerns or dramatic technological changes"), *id.* at 2132.

#### 1. Conduct Covered by the Plain Text of the Second Amendment Is Presumptively Constitutional.

Under *Bruen*, the threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that

conduct." *Id.* Any regulation that infringes on presumptively protected conduct is unconstitutional unless the government can provide adequate historical justification.

The plain text of the Amendment covers "the right of the people to keep and bear Arms." U.S. CONST. amend. II. In *Bruen*, the Supreme Court analyzed whether that text covered the petitioners' ability to publicly carry concealed handguns. *See* 142 S. Ct. at 2123, 2125, 2134-2135. The Court summarily recognized that the petitioners (who the parties agreed were "law-abiding") were part of "the people," and the firearms in question (handguns) fell within "Arms." *Id.* at 2134. Indeed, the Court had already indicated in *Heller* that the plain text of the Second Amendment *at least* covers the right of "law-abiding, responsible citizens" to possess "handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 635-636.

The new textual question presented in *Bruen* was whether the phrase "to keep and bear Arms" *also* covers public carry, not simply possession at home. *Bruen*, 142 S. Ct. at 2134. The Court had "little difficulty concluding that it does" because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* It also emphasized that the "central component" of the Second Amendment, self-defense, *id.* at 2135 (quoting Heller, 554 U.S. at 599), was important outside the home as well as within it. *Id.*

2. **The Government Must Show that Any Law Infringing on Presumptively Constitutional Conduct Is Consistent with the Nation's "Historical Tradition of Firearm Regulation."**

If a law infringes on presumptively constitutional conduct under the plain text of the Second Amendment, *Bruen* requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-2132. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.

*Bruen* places the burden on the government to prove that any regulation infringing on

presumptively constitutional conduct "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130; *see id.* at 2135. That burden is heavy and requires robust evidence of such a tradition. *Id.* at 2127; *see id.* 2130, 2141 n.11, 2149 n.25, 2153, 2156.

*Bruen* sets forth certain guideposts for courts to follow when evaluating such historical evidence.

**First**, it provides temporal guidance as to when the historical tradition must have been established. Specifically, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136. Therefore, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791[2], when the Second Amendment was ratified. *See id.* at 2135-2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-2132.

**Second**, *Bruen* differentiates between challenged regulations that address a "general societal problem that has persisted since the 18th century," *id.* at 2131, and those that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2132. In the former situation, the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a ***distinctly similar*** historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this

---

[2] *Bruen* declined to decide whether "courts should primarily rely on the prevailing understanding of an individual right" in 1791 (when the Bill of Rights was ratified) or 1868 (when the Fourteenth Amendment was ratified). *Bruen*, 142 S. Ct. at 2138. Mr. Ketzner asserts that the relevant historical tradition for a federal firearm restriction is that which existed in 1791. But even if the key date were 1868, Mr. Ketzner would still be entitled to relief, because there is no historical tradition of felon disarmament at that time either.

> timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131 (emphasis added); *see id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

Regulations implicating "unprecedented societal concerns" "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are ***relevantly similar***." *Id.* (emphasis added).

**Finally**, *Bruen* highlights two rules of adjudication. First, insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11; *see id.* at 2139. Second, courts are "entitled to decide a case based on the historical record compiled by the parties," consistent with "the principle of party presentation." *Id.* at 2130 n.6; *see id.* at 2150; *see also United States v. Bullock*, 2023 WL 4232309 (S.D. Miss. June 28, 2023) at *30-31 (finding Section 922(g)(1) unconstitutional as applied to defendant because the government did not meet its burden in that specific case).

### III. *HELLER* DID NOT FORECLOSE MR. KETZNER'S CONSTITUTIONAL CHALLENGES

As a threshold matter, *Heller* did not foreclose Mr. Ketzner's facial and as-applied challenges to Section 922(g)(1), although he recognizes that the Tenth Circuit has held otherwise and that his position is currently foreclosed in this circuit. *See McCane*, 573 F.3d 1037; *Vincent*,

80 F.4th 1197.

In *McCane*, the Tenth Circuit rejected a challenge to the constitutionality of Section 922(g)(1) based entirely on the dictum in *Heller* indicating that nothing in the case "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *McCane*, 573 F.3d at 1047 (quoting *Heller*, 554 U.S. at 626). *But see id.* at 1048-1049 (Tymkovich, J., concurring) (characterizing the "felon dispossession dictum" as "the opinion's *deus ex machina* dicta" because it "may lack the 'longstanding' historical basis that *Heller* ascribes to it"). As noted above, however, in making that statement, the *Heller* Court expressly caveated that it was not conducting a historical analysis of any such prohibitions. 554 U.S. at 626; *see Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (noting that the *Heller* Court "explicitly deferred analysis" of the felon possession issue). Nor did the *Heller* Court establish the test required to adjudicate Second Amendment challenges in general. *See Vincent*, 80 F.4th 1197 ("This [*Bruen*] test didn't exist when we decided *McCane*.").

Accordingly, it was not until *Bruen* that the Supreme Court set forth the test for evaluating such claims, which courts are now bound to apply. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (explaining that both the "result" of Supreme Court opinions and "those portions of the opinion necessary to that result" are binding); *Vincent*, 80 F.4th at 1197 (citing *Bruen* for the proposition that "[t]he Supreme Court has recently created a new test for the scope of the right to possess firearms"). That test demands a rigorous review of the regulatory history in the founding era *any time* a law infringes on conduct covered by the plain text of the Second Amendment. The majority opinion does not carve out any exceptions to the text-and-history test that it mandates. Accordingly, the dictum in *Heller* regarding supposedly "longstanding prohibitions" on felons can

no longer stand on its own.[3]

Moreover, as explained below, felon dispossession laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just dictum, but dictum based on a factually incorrect premise. Such an unsupported assertion cannot survive *Bruen*.

Ultimately, faced with a choice between *Heller*'s unsupported and unexplained dictum, and *Bruen*'s clear text-and-history test, courts must apply the latter. *See Seminole Tribe of Fla.*, 517 U.S. at 67. Therefore, *Heller* does not foreclose Mr. Ketzner's challenges under the Second Amendment.

## IV.    SECTION 922(G)(1) IS FACIALLY UNCONSTITUTIONAL UNDER THE SECOND AMENDMENT

Under the framework announced in *Bruen*, Section 922(g)(1) violates Mr. Ketzner's Second Amendment right to keep and bear arms. Because the Amendment's "plain text" does not differentiate between convicted felons and other members of "the people," a total prohibition on firearm possession by felons presumptively violates the Second Amendment. The government cannot rebut that presumption because there is no historical tradition of "distinctly similar" (or even "relevantly similar") felon dispossession laws.

---

[3] Indeed, the Supreme Court has recognized that its offhand dicta do not resolve issues the Court has not yet addressed. For example, in *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498-2499 (2022), the Court found entirely unpersuasive prior "tangential" dicta that addressed an issue that, until *Castro-Huerta*, "did not previously matter all that much and did not warrant [the] Court's review." 142 S. Ct. 2486, 2499 (2022). And in *Heller* itself, the Court stated, in reference to one of its prior decisions, that "[i]t is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 625 n.25.

    **A.   The Second Amendment's Plain Text Covers Firearm Possession by Felons.**

      The plain text of the Second Amendment clearly covers possession of a firearm, the conduct proscribed by Section 922(g)(1), including the firearms in this case. *See Heller*, 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); [*id.* at 629 (noting that "handguns are the most popular weapon chosen by Americans for self-defense in the home"); *Caetano v. Massachusetts*, 577 U.S. 411, 416–17 (2016) (Alito, J., concurring) (recognizing that "semiautomatic pistols" are among the "weapons most commonly used today for self-defense"); *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari) (referring to "AR-style semiautomatic rifles" as "modern sporting rifles" that "many Americans own for lawful purposes like self-defense, hunting, and target shooting").].

      Likewise, Mr. Ketzner is part of "the people" within the meaning of the Second Amendment. Just as the Amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it also does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text," *id.*, suggests that those who have been convicted of a felony are unentitled to the amendment's protection, *see Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc) (determining that the petitioner, a nonviolent felon, was among "the people" protected by the Second Amendment).

      *Heller* plainly supports this conclusion. Construing the words "the people" in that case, the Court said, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments— "belongs to all Americans." *Id.* at 580-581. Interpreting "the people" to exclude felons would

conflict with that principle. *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (pointing out that *Heller* interprets "the word 'people' as referring to 'all Americans'" and that "[n]either felons nor the mentally ill are categorically excluded from our national community"); *Range*, 69 F.4th at 102 ("[W]e see no reason to adopt an inconsistent reading of "the people."").

The government has elsewhere argued that felons are not part of "the people" for purposes of the Second Amendment because *Heller* refers to "law-abiding" citizens. But that argument misinterprets *Heller*. The *Heller* Court merely acknowledged that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. This language does not limit the Second Amendment right to non-felons (nor does it define "law-abiding"). By beginning the passage with "whatever else it leaves to future evaluation," the Court made clear that it was merely establishing a Second Amendment floor, not a ceiling.

*Bruen* further dispels any ambiguity as to this point. The *Heller* language references the right of "law-abiding, responsible citizens" to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then no one would have a right to use firearms outside the home. But *Bruen* held that the Second Amendment right does extend outside the home. *Bruen*, 142 S. Ct. 2111.[4]

Moreover, it is especially wrongheaded to read the "law-abiding" language for more than what it says, because neither *Heller* nor *Bruen* define what it means to be "law-abiding." Certainly,

---

[4] Mr. Ketzner recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. But that is because the petitioners alleged that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Bruen*, 142 S. Ct. at 2124-2125. No other questions were before the Court in *Bruen*. *See Range*, 69 F.4th at 101 (noting that "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases").

neither case equates the term with the definition of a felony or felony-equivalent offense under Section 922(g)(1), or even with criminal offenses as opposed to civil ones. *See Range*, 69 F.4th at 101 (rejecting the government's claim that only "law-abiding" citizens are protected by the Second Amendment, in part because it "devolves authority to legislators to decide whom to exclude from 'the people'" and allows legislatures "unreviewable power to manipulate the Second Amendment by choosing a label"); *Bullock*, 2023 WL 4232309, at *21. And it would be surprising if the government's position is that any person who jaywalks in violation of a local traffic ordinance can be permanently deprived of one of their fundamental constitutional rights.

Ultimately, the Supreme Court's use of the phrase "law-abiding" cannot be understood as a ruling, devoid of analysis, that forecloses millions of Americans from the protections of one of our nation's fundamental constitutional rights. *See Range*, 69 F.4th at 101 ("And while we heed [the law-abiding] phrase, we are careful not to overread it as we and other circuits did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny.").

### B. The Government Will Not be Able to Show That §922(g)(1) is Part of The Nation's Historical Tradition of Firearm Regulation.

Because "the Second Amendment's plain text covers Mr. Ketzner's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that Section 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that Section 922(g)(1) is designed to address—whether to permit persons convicted of felonies or felony-equivalent crimes to own guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, Section 922(g)(1) is unconstitutional unless the government shows a robust tradition of

"distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.*

The government cannot make that showing. What is today § 922(g)(1) traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251). At that time, the statute "covered only a few violent offenses." *Id.* It was not until the 1960s that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137.

Even if the Court broadens its focus to consider state statutes as well, the government will not be able to support its burden to show a historical tradition of firearm regulation distinctly similar to § 922(g)(1). For example, in 2007, a history professor at the University of Hartford concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142-143 & n.11 (2007). Similarly, a law professor at the University of California, Davis, has written, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009). Other scholars agree. *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009).

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *See Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons. *See id.* at 2131. But they declined to do so, and that inaction means § 922(g)(1) is facially unconstitutional.

## V. SECTION 922(G)(1) IS UNCONSTITUTIONAL AS APPLIED TO NONVIOLENT FELONS

Section 922(g)(1) is unconstitutional as applied if the government cannot demonstrate a distinctly similar historical tradition with respect to the particular circumstances of a given case, like Mr. Ketzner's. Thus, this Court can hold Section 922(g)(1) unconstitutional as applied to Mr. Ketzner *even if* the government could meet its burden with respect to *some* applications of Section 922(g)(1) (which it cannot).

The analysis under the plain text of the Second Amendment is the same for Mr. Ketzner's facial and as-applied challenges: his possession of a firearm is covered conduct, and therefore presumptively constitutional. And as previously discussed, the government cannot meet its burden of proving that *any* felon dispossession was part of this nation's historical tradition of firearm regulation at the time of the founding. That is *especially* true with respect to persons like Mr. Ketzner, who does not have any violent qualifying prior offenses under Section 922(g)(1).[5]

---

[5] Whether a person is a prohibited person under § 922(g)(1) depends entirely on the person's past criminal history. The defendant must have a separate qualifying conviction, and that conviction must predate the § 922(g)(1) offense. A person cannot be convicted under § 922(g)(1) based on simultaneous pending charges, conduct that occurs during or after the person is caught possessing a firearm, or other circumstances that do not constitute a prior conviction. 18 U.S.C. § 922(g)(1); *see* Tenth Circuit Pattern Jury Instructions (Criminal) 2.44 (2021); *United States v. Hisey*, 12 F.4th 1231, 1234 (10th Cir. 2021). Mr. Ketzner does not concede that he is a prohibited person under § 922(g)(1); rather, his point is that, to the extent the government can prove otherwise, it's only conceivable basis for doing so would be based on nonviolent offenses.

As the en banc Third Circuit recently reasoned in *Range*, "[t]hat Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Mr. Ketzher is part of a similar group today." 69 F.4th at 105; *see United States v. Forbis*, Case No. 23-cr-133-GKF, Doc. 37 (N.D. Okla. Aug. 17, 2023) (granting as-applied challenge for defendant with history of drug possession); *United States v. Quailes*, 2023 WL 5401733 (M.D. Pa Aug. 22, 2023) (granting as-applied challenge for defendant with drug trafficking convictions); *United States v. Harper*, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023) (granting as-applied challenge for defendant with multiple armed robbery and drug trafficking convictions); *Bullock*, 2023 WL 4232309 (finding Section 922(g)(1) unconstitutional as applied to defendant with prior convictions for aggravated assault and manslaughter). Because the government was thus unable to prove the existence of a national "historical tradition of firearms regulation" that "supports depriving" a nonviolent felon of his Second Amendment right to possess firearms, the Third Circuit held § 922(g)(1) unconstitutional as applied to a man whose prior criminal history consisted solely of a nonviolent offense. *See Range*, 69 F.4th at 106. This Court should reach the same conclusion here with respect to Mr. Ketzner.

Indeed, while there is some pre-*Bruen* caselaw and scholarship discussing some founding-era evidence that, in the views of some judges, supports "the proposition that the state can take the right to bear arms away from a category of people it deems dangerous," there is none for "the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting); *see also, e.g., Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting). Even if this historical evidence were sufficient under *Bruen* to justify disarmament of persons with violent qualifying priors (and it is not), it clearly cannot support disarmament of Mr. Ketzner, who does not have any violent history that

could possibly constitute qualifying prior offenses under § 922(g)(1). *See Range*, 69 F.4th at 106 (determining that § 922(g)(1) was unconstitutional as applied to persons "like" the nonviolent petitioner). Therefore, Mr. Ketzner was not a constitutionally prohibited person at the time of the instant offense, *even if* § 922(g)(1) could be applied to persons with certain violent, qualifying felony histories.

## VI.     CONCLUSION

Wherefore, Mr. Ketzner respectfully requests this Court dismiss the indictment because it violates the Second Amendment.

Respectfully submitted, this 4th day of December, 2023.

VIRGINIA L. GRADY
Federal Public Defender

/s/ *Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Mr. Ketzner

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, I electronically filed the foregoing **JASON KETZNER'S MOTION TO DISMISS THE INDICTMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Jeffrey K. Graves, AUSA
Email: jeffrey.graves@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Jason Ketzner (Via Mail)

/s/ *Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Mr. Ketzner